**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| **ADVANCED MICRO TARGETING, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 4:25-00881-CV-DGK** |
| | ) | |
| **LET THE VOTERS DECIDE, LLC** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| **-and-** | ) | |
| | ) | |
| **VORTEX ELITE, LLC** | ) | |
| | ) | |
| **-and-** | ) | |
| | ) | |
| **SYNERGY WISE SOLUTIONS, LLC** | ) | |
| **Registered Agent for Service of Process:** | ) | |
|     **United States Corporation Agents, Inc.** | ) | |
|     **Attn: Erik Treutlein** | ) | |
|     **1820 E. Ray Road, #1000** | ) | |
|     **Chandler, Arizona 85225** | ) | |
| | ) | |
| **-and-** | ) | |
| | ) | |
| **ONEST MARKETING LLC** | ) | |
| **Registered Agent for Service of Process:** | ) | |
|     **Kevin B. Diego** | ) | |
|     **1900 N. Bayshore Drive 3614** | ) | |
|     **Miami, Florida 33132** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

## FIRST AMENDED VERIFIED COMPLAINT FOR
## TEMPORARY RESTRAINING ORDER, INJUNCTIVE RELIEF, AND DAMAGES

---

Plaintiff Advanced Micro Targeting, Inc. ("AMT" or "Plaintiff"), by and through the

undersigned counsel, for its First Amended Verified Complaint for Temporary Restraining Order,

Injunctive Relief, and Damages against Defendants Let the Voters Decide, LLC ("LTVD"), Vortex

Elite, LLC ("Vortex"), Synergy Wise Solutions, LLC, ("Synergy"), and Onest Marketing, LLC ("Onest") (collectively "Defendants"), states and alleges as follows:

## NATURE OF THIS ACTION

1. AMT is a company that specializes in running political initiatives and campaigns of all sizes and scopes. AMT offers ballot qualification, petition campaign, voter outreach, grassroots and grass tops organizing, increasing voter turnout, and micro-targeted direct mail services to clients across the country, including in Missouri. To that end, AMT maintains a team of trained individuals who have experience in political initiatives and campaigning, and who work directly with voters to obtain signatures for petitions to support various ballot initiatives and candidates.

2. LTVD and Vortex are companies that also specialize in political strategy, initiative qualification, campaigns, and voter outreach. LTVD and Vortex are a director competitors of AMT.

3. Onest and Synergy are in the business of providing general consulting services and working on state and local ballot measures nationwide. Like LTVD and Vortex, Onest and Synergy are direct competitors of AMT.

4. Defendants have conspired to launch an intentional and malicious effort to interfere with AMT's operations in Missouri, to dismantle AMT's Missouri workforce, to prevent AMT from serving its clients in the state of Missouri, to eliminate AMT's ability to complete a time-sensitive ballot initiative project for its client in Missouri (the "Missouri Project"), and to cause permanent damage to AMT's reputation as a business.

5. Specifically, Defendants have embarked on a campaign to coerce AMT's employees (many who are based in Columbia, Kansas City, Springfield, and St. Louis, and all of

whom have employment agreements with various restrictive covenants) to leave their employment with AMT and to work for Defendants or otherwise violate their contracts. As of the date of this filing, Defendants have successfully poached at least 28 employees from AMT's Missouri operations, with that number increasing every day.

6.     To execute this campaign, Defendants have hired away AMT employees to recruit current AMT employees (despite binding employee non-solicitation restrictions that should have prevented such activity) and to provide Defendants with confidential information about AMT's operations and employees, including proprietary data relating to AMT's strategy, employee performance, and other confidential business information.

7.     For example, one of the former AMT employees now working for Defendants is Amanda Campbell. Ms. Campbell had a contract with AMT that included an employee non-solicitation provision. Despite this restriction, Ms. Campbell has called multiple AMT employees on behalf of Defendants to induce the employees to leave their employment with AMT. She has successfully poached at least one AMT employee – Adam Ellis – who resigned his employment with AMT to work for Defendants. Ms. Campbell's efforts are a clear in violation of her contractual obligations to AMT. Despite knowing of these restrictions, Defendants encouraged and supported Ms. Campbell to breach her contractual obligations to AMT to benefit Defendants.

8.     Perhaps more shocking is the fact that Defendants are using AMT's confidential information and trade secrets to steal away AMT's employees, including but not limited to a document identifying AMT's employees by name, providing detailed information about their performance and productivity, and ranking them in order of their performance. Defendants are offering the employees on this confidential list huge sums of money (some were offered as much

as $30,000) to resign their employment with AMT and provide "intelligence gathering" services for Defendants.

9.      Defendants' offers to AMT employees using AMT's own confidential information clearly constitutes unfair competition.

10.     Further, Defendants have offered to pay AMT's employees cash to disparage AMT, to participate in a smear campaign against the company, to leave their employment with the company, and to convince other AMT employees to leave their employment.

11.     Defendants' efforts are a part of a larger strategy to prohibit AMT from servicing its clients in Missouri, to prevent AMT from having a successful initiative relating to getting a congressional redistricting measure on the ballot, and to unfairly compete against AMT.

12.     AMT's Missouri Project is set to end in the beginning of December 2025, in conjunction with the state deadline for ballot measure submissions.

13.     Emergency relief is paramount to preserve the status quo and prevent Defendants from further causing irreparable harm to Defendants' reputation with its employees and clients.

14.     Consequently, AMT brings this action to enjoin Defendants from their tortious actions, from their continued use of AMT's trade secrets and confidential business information, and from unfairly competing with AMT.

## PARTIES, JURISDICTION, AND VENUE

15.     Plaintiff AMT is a corporation organized under the laws of the state of Nevada with its principal place of business located at 5757 Alpha Road, Suite 501, Dallas, Texas 75240, and is therefore a citizen of the states of Nevada and Texas. AMT is registered and in good standing to conduct business in Missouri.

16.     Defendant LTVD is a limited liability company organized under the laws of the state of Florida that has its principal place of business at 52 Riley Road #305, Celebration, Florida 34747. LTVD is therefore a citizen of the state of Florida.

17.     Defendant Vortex is a limited liability company organized under the laws of the state of Florida that had its principal place of business at 8347 NW 54th Street, Miami, Florida 33166. Vortex is therefore a citizen of the state of Florida.

18.     Defendant Synergy is a limited liability company organized under the laws of the state of Arizona with its principal place of business at 2900 E. Broadway Blvd., Suite 100, Tucson, Arizona 85716. Synergy is therefore a citizen of the state of Arizona.

19.     Defendant Onest is a limited liability company organized under the laws of the state of Florida with its principal place of business at 1900 N. Bayshore Drive 3614, Miami, Florida 33132. Onest is therefore a citizen of the state of Florida.

20.     Defendants conduct substantial and continuous business operations throughout the state of Missouri.

21.     This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because AMT is asserting claims under the federal Defend Trade Secrets Act (18 U.S.C. § 1831, *et seq.*), as well as pursuant to 28 U.S.C. § 1332(a) because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of costs and interest.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2) because the events or omissions giving rise to these causes of action occurred, in whole or in part, in this District.

## ALLEGATIONS COMMON TO ALL COUNTS

**AMT AND DEFENDANTS ARE DIRECT COMPETITORS**

23.     AMT is a company that supports its clients by providing strategy advice, targeting and analytics, voter contact and outreach, and services related to running successful political campaigns and initiatives to clients across the country, including in Missouri.

24.     AMT's workforce consists of a skilled set of employees who serve as voter contact specialists, petitioners, canvassers, team leaders, and project managers for the company's various projects across the country.

25.     Part of the services AMT provides to its clients includes signature gathering on petitions to support various ballot initiatives.

26.     Like AMT, Defendants are all in the political initiative and campaign business, and also offer petition campaign, voter outreach, and ballot initiative support and consulting services to clients across the country, including in the state of Missouri.

**AMT LEADS INITIATIVE TO GET REDISTRICTING ON THE MISSOURI BALLOT**

27.     One of AMT's ongoing projects involves working on behalf of a client to gather signatures to support a petition to place congressional redistricting on the Missouri ballot, which is referred to herein as the Missouri Project.

28.     In connection with this initiative, AMT hired and assigned a specific group of employees to assist with supporting the Missouri Project, connecting with voters, and obtaining the signatures necessary to support the ballot measure.

29.     These employees included, among others, the following individuals (referred to collectively hereinafter as "Former AMT Employees"): Jasmine Allen, Darryll Anderson, Anita Beauchan, Kevin Brefford, Amanda Campbell, Jeffrey Clayton, Robert Crane, Robert Davenport,

Sally Davis, Jennifer Deborde, Adam Ellis, Mary Hall, William Hosmer, Collins McDonald, Raomel Morrison, Byron Mullen, Nelson Ortiz, Richard Robinson, Derrick Theoc, Yuri Usenko, and Shaneka Ward.

30.     Upon their hire and in consideration of their employment, each of the Former AMT Employees executed an employment agreement with various restrictive covenants, including but not limited to conflict of interest, confidentiality, non-competition, employee non-solicitation, and customer non-solicitation provisions.

31.     The Former AMT Employees' agreements are substantially similar and include identical material provisions. These agreements will be referred to herein as "Former AMT Employee Agreements" and are attached as exhibits hereto and incorporated as though fully set forth herein. *See* **Exhibit 1**, Anderson Agreement, **Exhibit 2**, Beauchan Agreement, **Exhibit 3**, Brefford Agreement, **Exhibit 4**, Campbell Agreement, **Exhibit 5**, Clayton Agreement, **Exhibit 6**, Crane Agreement, **Exhibit 7**, Davenport Agreement, **Exhibit 8**, Davis Agreement, **Exhibit 9**, Deborde Agreement, **Exhibit 10**, Ellis Agreement, **Exhibit 11**, Hall Agreement, **Exhibit 12**, McDonald Agreement, **Exhibit 13**, Morrison Agreement, **Exhibit 14**, Mullen Agreement, **Exhibit 15**, Ortiz Agreement, **Exhibit 16**, Robinson Agreement, **Exhibit 17**, Theoc Agreement, and **Exhibit 18**, Usenko Agreement; **Exhibit 21**, Hosmer Agreement; **Exhibit 22**; Ward Agreement; **Exhibit 25**, Allen Agreement.

32.     Specifically, each Former AMT Employee Agreement includes the following non-competition provision:

> **Section 7: Non-Competition.** The Employee agrees that during Employee's term of active employment with Employer and for a period of one (1) year after the end of that term, Employee will not, directly or indirectly, as employee, owner, sole proprietor, partner, director, member, consultant, agent, founder, co-venturer or otherwise, solely or jointly with others engage in any business that is in competition with the business of Employer or the current or active clients of Employer within any geographic area in which Employer conducts its business, or give advice or lend credit, money or Employee's reputation to any natural person or business entity engaged in a competing business in any geographic area in which Employer conducts its business.

*See* Exhibits 1-18, 21-22, 25.

33.     The Former AMT Employee Agreements also include a non-solicitation provision, which provides as follows:

> **Section 8: Non-Solicitation.** Employee understands and agrees that any attempt on the part of Employee to induce other employees or contractors to leave Employer's employ, or any effort by Employee to interfere with Employer's relationship with its other employees and contractors would be harmful and damaging to Employer. Employee agrees that during Employee's term of employment with
>
> Employer and for a period of one (1) year after the end of that term, Employee will not in any way, directly or indirectly:
>
>     a.  Induce or attempt to induce any employee or contractor of Employer to quit employment or retainer with Employer;
>
>     b.  Otherwise interfere with or disrupt Employer's relationship with its employees and contractors;
>
>     c.  Discuss employment opportunities or provide information about competitive employment to any of Employer's employees or contractors; or
>
>     d.  Solicit, entice, or hire away any employee or contractor of Employer for the purpose of an employment opportunity that is in competition with Employer.
>
> This non-solicitation obligation as described in this section will be limited to employees or contractors who were employees or contractors of Employer during the period that Employee was employed by Employer.
>
> During the term of Employee's active employment with Employer, and for one (1) year thereafter, Employee will not divert or attempt to divert from Employer any business Employer had enjoyed, solicited, or attempted to solicit, from its customers, prior to termination or expiration, as the case may be, of Employee's employment with Employer.

*See* Exhibits 1-18, 21-22, 25.

34.     In the Former AMT Employee Agreements, each Former AMT Employee agreed to injunctive relief as a remedy for breach of the contract:

> Section 17. Remedies/Dispute Resolution. In the event of a breach or threatened breach by Employee of any of the provisions of this Agreement, Employee agrees that Employer is entitled to a permanent injunction, in addition to and not in limitation of any other rights and remedies available to Employer at law or in equity, in order to prevent or restrain any such breach by Employee or by Employee's partners, agents, representatives, servants, employees, and/or any and all persons directly or indirectly acting for or with Employee.

*See* Exhibits 1-18, 21-22, 9.

**DEFENDANTS INTENTIONALLY INTERFERE WITH AMT'S CONTRACTS TO DERAIL OPERATIONS**

35.     On or about November 3, 2025, AMT learned that Defendants had started a campaign to block the Missouri ballot measure AMT was undertaking in Missouri in conjunction with the Missouri Project.

36.     Defendants' efforts went beyond merely blocking the measure.

37.     Defendants, knowing that at least some of the Former AMT Employees had Employment Agreements with AMT, began an intentional and targeted raid of AMT's Missouri workforce.

38.     Beginning on November 3, 2025, AMT employees started resigning *en masse*.

39.     On or about November 6, 2025, Amanda Campbell, one of the employees AMT hired to assist with the Missouri Project, unexpectedly resigned.

40.     Ms. Campbell went to work for, and is still working for, one or more of the Defendants.

41.     Despite having an employee non-solicitation provision in her Employee Agreement with AMT, Ms. Campbell called multiple AMT employees (including but not limited to Adam Ellis and Deaunte Hicks) on Defendants' behalf to induce them to resign their employment with AMT and sign a contract with one or more of Defendants.

42.     After speaking to Ms. Campbell, Adam Ellis also resigned his employment with AMT.

43.     As of the filing of this First Amended Verified Complaint, at least 28 AMT employees have resigned, and at least some (if not all) are now working for Defendants.

**DEFENDANTS PUBLISH A SMEAR VIDEO FEATURING NON-AMT EMPLOYEES**

44.     In addition, Defendants sent text messages to AMT employees seeking "video testimonials" relating to AMT.  **Exhibit 19**, Solicitation Text Message.

45.     Defendants offered to pay the employees $250 for providing these testimonials. *See* Exhibit 19.

46.     On or about November 6, 2025, Defendants used these purported "video testimonials" to create a video smear campaign ("Smear Video") disparaging AMT. **Exhibit 20**, Smear Video.

47.     Among other untrue statements, the Smear Video indicates that AMT did not provide its employees with a hotel with working water or food or money. These statements in the Smear Video are false.

48.     Further, two of the individuals identified in the Smear Video were offered jobs by AMT, but never actually worked for AMT. They were represented in the Smear Video as former AMT employees, which is also false.

49.     The Smear Video has been widely shared by Defendants across social media and disseminated to the public, including on various social media pages dedicated to individuals looking for employment as a paid petitioner. *See, e.g.*, https://www.facebook.com/groups/2625453047500471.

50.     At least some of AMT's employees are aware of and have seen the Smear Video.

**DEFENDANTS ARE TARGETING AND HARASSING AMT EMPLOYEES IN PERSON**

51.     In addition to their smear campaign, Defendants (through their employees and agents including, among others, Synergy Member Beverly Weiss), have approached (and are approaching) AMT employees in person to pressure them into leaving their jobs.

52.     On at least one occasion, an AMT employee was followed after work by two individuals who the AMT employee believed to be associated with Defendants. The two individuals asked the employee to quit her job with AMT and offered her $7,500 to resign.

53.     During that encounter, the two individuals also tried to get the AMT employee to disparage AMT, and they told her that they had "been going to all the different stores trying to find" AMT employees.

54.     After the AMT employee refused to provide disparaging information to the individuals, the individuals continued to harass her, followed her by car as she drove away, and caused the employee to have to take a circuitous route home out of fear for her safety.

**DEFENDANTS ARE OFFERING THOUSANDS OF DOLLARS TO AMT EMPLOYEES TO BREACH THEIR CONTRACTUAL OBLIGATIONS**

55.     On or about November 10, AMT learned that multiple employees of Defendants have offered to pay $20,000 each to multiple AMT employees (including managerial level employees) in Missouri to convince them to resign their employment with AMT.

56.     On or about November 15, AMT learned that Defendant Synergy, through Beverly Weiss, also approached multiple AMT employees and offered to pay them up to $30,000 to abandon their employment with AMT and work for Synergy.

57.     One AMT employee approached by Ms. Weiss is Shaneka Ward, who was employed by AMT as a canvasser on the Missouri Project.

58.     On or about November 11, Ms. Ward was approached by Ms. Weiss and offered $20,000 to resign her employment with AMT and to sign a contract with Synergy to provide, among other tasks, "intelligence gathering" services for Synergy. A partial copy of Professional Services Contract that Ms. Ward signed is attached hereto as **Exhibit 23**.[1]

59.     It is AMT's understanding that part of the "intelligence gathering" services that Ms. Ward was to provide to Synergy involved providing information about strategies she learned during her employment with AMT.

60.     Ms. Ward was persuaded to sign the contract with Synergy, received a $20,000 payment, and resigned her employment with AMT.

61.     Defendants also approached Jasmine Allen, one of AMT's top performers, and offered Ms. Allen $30,000 to resign her employment with AMT and to sign a contract with Defendants to provide, among other tasks, "intelligence gathering" services for Synergy.

62.     Ms. Ward, acting as an agent of Synergy, also contacted Jasmine Allen and encouraged her to take a $30,000 payment to leave AMT.

63.     Ms. Allen was persuaded to sign the contract, received a $30,000 payment, and resigned her employment with AMT.

64.     Onest also approached William Hosmer and offered to pay him $10,000 to resign from AMT and work for Onest.  A copy of Mr. Hosmer's contract with Onest is attached hereto as **Exhibit 24**.

---

[1] Plaintiff does not currently have the full version of the contract but will supplement this filing with the complete version as soon as one is received.

65.     To convince Mr. Hosmer to sign the contract with Onest, Onest aggressively pursued him. Employees and/or representatives of Onest contacted Mr. Hosmer incessantly during the workday and pressured him to sign a contract with Onest.

66.     Mr. Hosmer eventually gave in to Onest's coercive and harassing tactics, signed a contract to work for Onest, and resigned his employment with AMT.

67.     To aid in their solicitation efforts, including the efforts identified above, Defendants used AMT's Daily Valid Average list – a highly confidential document that outlines, among other things, each employee's names, territories, performance metrics, and ranking.

68.     When they approached AMT employees including but not limited to some of the employees listed above, Defendants told the AMT employees that the value of the compensation they were offered by Defendants was tied to where they were ranked on AMT's Daily Valid Average list and that the higher the ranking on the list, the more money they were being offered by Defendants.

**AMT SUFFERS IRREPARABLE HARM**

69.     Defendants' actions are a coordinated effort to interfere with AMT's ability to operate its business in the state of Missouri.

70.     Defendants have gutted AMT's Missouri workforce by using AMT's trade secrets, confidential information, and employees against the company.

71.     As of Defendants' actions, AMT's reputation in the public has been tarnished, making it difficult for AMT to recruit and hire replacement employees.

72.     Defendants' conduct has resulted, and will continue to result, in irreparable injury and harm to AMT, including without limitation, loss of customers, employees, good will, customer

confidence, confidential business information, reputation, contracts with customers, referral sources, competitive advantage, and the conduct is also causing an unknown economic loss.

73.     Defendants' wrongful conduct leaves AMT with little choice but to file this lawsuit seeking (i) a temporary restraining order, a preliminary injunction, and permanent injunctive relief to prevent irreparable harm to AMT's business; and (2) recovery of monetary damages (in an amount to be proven at trial) for the harm caused by Defendants.  Indeed, Defendants' wrongful conduct falls squarely within the type of unfair competition that harms AMT specifically and American voters, businesses, and the economy in general.  Unless halted immediately, Defendants' wrongful actions will continue to cause irreparable harm to AMT's business through unfair competition, unjustly enriching Defendants in the process.

## COUNT I: TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY
## AND CONTRACTUAL RELATIONS
### (Against All Defendants)

74.     AMT incorporates by reference the allegations set forth in each of the foregoing paragraphs of this Verified Complaint as if fully set forth herein.

75.     The Former AMT Employee Agreements, including Amanda Campbell's and Shaneka Ward's Employment Agreements, are valid and enforceable contracts supported by adequate consideration.

76.     Upon information and belief, Defendants had actual knowledge of the Former AMT Employee Agreements (including Ms. Campbell's and Ms. Ward's agreements), as well as the restrictive covenants contained therein.

77.     By soliciting AMT employees, inducing them to leave their employment with AMT, otherwise interfering with or disrupting AMT's relationship with its employees, discussing

competitive employment with AMT's employees, or soliciting, enticing, or hiring away AMT's employees, Amanda Campbell breached her AMT Employment Agreement.

78.     By soliciting AMT employees, inducing them to leave their employment with AMT, otherwise interfering with or disrupting AMT's relationship with its employees, discussing competitive employment with AMT's employees, or soliciting, enticing, or hiring away AMT's employees, Shaneka Ward breached her AMT Employment Agreement.

79.     By allowing, directing, and/or encouraging, at a minimum, Amanda Campbell and Shaneka Ward to breach their contracts with AMT, Defendants have intentionally interfered with the contracts AMT had with, at a minimum, Amanda Campbell and Shaneka Ward.

80.     Furthermore, Defendants intentionally interfered with AMT's business expectancy with respect to its employees by contacting them to solicit their services away from AMT.

81.     Defendants had no justification for their intentional interference in AMT's contracts.

82.     AMT has suffered damages as a result of Defendants' conduct.

83.     The actions of Defendants as alleged in Count I were willful and malicious and demonstrate a complete indifference to, or a conscious disregard for, the rights of AMT entitling AMT to an award of punitive damages.

### COUNT II: MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF DEFEND TRADE SECRETS ACT (18 U.S.C. § 1831, *et seq.*)
**(Against All Defendants)**

84.     AMT incorporates by reference the allegations set forth in each of the foregoing paragraphs of this First Amended Verified Complaint as if fully set forth herein.

85.     The Daily Valid Average list misappropriated by and/or disclosed to Defendants constitutes a trade secret of AMT that is subject to protection under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831, *et seq.*

86.     The information contained in these files and data is valuable because it is not generally known or readily accessible, through proper means, to others who can profit from its use.  AMT has spent significant sums, in terms of both financial and human resources, to develop and maintain this information, which would be of great value to any competitor.

87.     The information contained in these files and data is related to products or services used in, or intended for use in, interstate commerce.

88.     AMT takes and, at all times relevant hereto, has taken reasonable measures to maintain the confidential and secret nature of this information. Those steps include but are not limited to: (a) confidentiality policies and agreements; (b) restricting availability of certain confidential information to key employees; and (c) physical security measures, such as password protection for all computers and segregation of certain files so that only employees with a need to access the files can do so.

89.     Defendants obtained the information contained in the Daily Valid Average list by improper means.

90.     Defendants' foregoing conduct constitutes an actual and threatened misappropriation and misuse of AMT's trade secret information in violation of the DTSA.

91.     Defendants improperly retained, used, and/or disclosed (and continues to retain, use, and/or disclose) the confidential business information, including the Daily Valid Average list, without authorization to do so.

92. As a direct and proximate result of Defendants' actual and threatened misappropriation of AMT's trade secrets, AMT has suffered irreparable harm and will continue to suffer irreparable harm that cannot be adequately remedied at law unless Defendants are enjoined from engaging in any further acts of misappropriation and from continued possession in any form of trade secret information belonging to AMT.

93. As a direct and proximate result of Defendants' misappropriation, AMT has suffered and continues to suffer damages and irreparable harm, and is entitled to all damages, attorneys' fees, costs and remedies permitted under the DTSA.

94. Each of the acts of misappropriation was done maliciously by Defendants, thereby entitling AMT to exemplary damages to be proved at trial.

## COUNT III: BUSINESS DEFAMATION
### (Against All Defendants)

95. AMT incorporates by reference the allegations set forth in each of the foregoing paragraphs of this First Amended Verified Complaint as if fully set forth herein.

96. Defendants published the Smear Video widely on social media platforms accessible to AMT employees, customers, and the public in general.

97. The statements made on the Smear Video specifically identified AMT and were false and defamatory.

98. Among other things, some of the false information provided in the Smear Video included that AMT did not provide adequate working conditions to AMT employees. Specifically, the statements that the "employees" – who were not even AMT employees – were not provided a hotel with working water or food or money were false.

99. Moreover, two individuals featured in the Smear Video were not AMT employees, despite holding themselves out to have worked for the company.

100.    The publication of the Smear Video has caused irreparable harm to AMT's reputation and business operations, including but not limited to the unprecedented loss of its workforce in Missouri, and interruption to AMT's ability to complete the Missouri Project, and a variety of other reputational harm.

101.    The actions of Defendants as alleged in Count III were willful and malicious and demonstrate a complete indifference to, or a conscious disregard for, the rights of AMT entitling AMT to an award of punitive damages.

## COUNT IV: INJURIOUS FALSEHOOD
### (Against All Defendants)

102.    AMT incorporates by reference the allegations set forth in each of the foregoing paragraphs of this First Amended Verified Complaint as if fully set forth herein.

103.    Through their publication of the Smear Video, Defendants published a false statement about AMT that was harmful to AMT's interests.

104.    By publishing the Smear Video, Defendants intended to harm the interests of AMT and cause pecuniary harm to AMT or should have recognized that the publication was likely to result in harm.

105.     Defendants knew that the statements in the Smear Video were false or made in reckless disregard of their truth or falsity.

106.    AMT has suffered damages as a result of Defendants' conduct.

107.    The actions of Defendants as alleged in Count IV were willful and malicious and demonstrate a complete indifference to, or a conscious disregard for, the rights of AMT entitling AMT to an award of punitive damages.

## COUNT V: UNFAIR COMPETITION
### (Against All Defendants)

108.    AMT incorporates by reference the allegations set forth in each of the foregoing paragraphs of this First Amended Verified Complaint as if fully set forth herein.

109.    Defendants' conduct described herein constitutes an unfair method of competition.

110.    Defendants wrongfully and intentionally interfered with AMT's contractual relationships with the Former AMT Employees in order to unfairly compete, gain a competitive advantage in the marketplace, and cause harm or otherwise be detrimental to AMT.

111.    Defendants' conduct interfered with an continues to interfere with AMT's ability to conduct its business.

112.    As a direct and proximate result of the acts and course of conduct of Defendants described herein, AMT has suffered and will continue to suffer irreparable harm and loss, in addition to damages.

113.    The actions of Defendants as alleged in Count V were willful and malicious and demonstrate a complete indifference to, or a conscious disregard for, the rights of AMT entitling AMT to an award of punitive damages.

## COUNT VI: UNJUST ENRICHMENT
### (Against All Defendants)

114.    AMT incorporates by reference the allegations set forth in each of the foregoing paragraphs of this First Amended Verified Complaint as if fully set forth herein.

115.    As a result of their misconduct alleged in this First Amended Verified Complaint, Defendants have been unjustly enriched.

116.    The retention of these benefits by Defendants under the circumstances is inequitable and, therefore, Defendants should be required to disgorge their wrongful gains.

## COUNT VII: CIVIL CONSPIRACY
### (Against All Defendants)

117.    AMT incorporates by reference the allegations set forth in each of the foregoing paragraphs of this First Amended Verified Complaint as if fully set forth herein.

118.    Upon information and belief, Defendants conspired unlawfully to target AMT's employees on behalf of Defendants, including by Amanda Campbell, Shaneka Ward, and Beverly Weiss, in an effort to unfairly compete with and otherwise cause harm to AMT.

119.    Defendants further conspired to harm AMT by raiding and recruiting its employees to work for Defendants and solicit AMT employees (including at a minimum, Amanda Campbell and Shaneka Ward) in direct violation of their contractual obligations to AMT, and in an effort to unfairly compete against AMT.

120.    To that end, Defendants had a meeting of the minds with the object of accomplishing the unlawful conduct stated in this First Amended Verified Complaint.

121.    Defendants did perform one or more unlawful, overt acts in furtherance of accomplishing their objective, as set forth herein.

122.    AMT has suffered damages as a result of this conspiracy.

123.    The actions of Defendants, as alleged herein, were willful and malicious and demonstrate a complete indifference to or a conscious disregard for the rights of AMT.

### PRAYER FOR RELIEF

WHEREFORE, based on the foregoing, Plaintiff Advanced Micro Targeting, Inc. respectfully requests the Court grant the following relief:

(a)    temporary, preliminary, and permanent injunctive relief:

(i)        enjoining Defendants (and all others acting in concert with them) from soliciting, supporting, or encouraging AMT employees to violate the terms of their Employment Agreements;

(ii)       enjoining Defendants (and all others acting in concert with them) from interfering with contracts between AMT and AMT employees;

(iii)      enjoining Defendants (and all others acting in concert with them) from employing AMT employees in violation of their Employment Agreements;

(iv)      requiring Defendants to immediately remove the Smear Video from all social media outlets, websites, electronic platforms, and any other locations in which the video has been published;

(v)       directly or indirectly making use of confidential, proprietary, trade secret information belonging to AMT.

(b)     that AMT be relieved of any obligation to post an injunction bond;

(c)     the entry of a judgment for monetary damages for Defendants' wrongful acts as are fair and reasonable, including actual damages, punitive damages, equitable relief, pre-judgment and post-judgment interest, costs, and attorneys' fees;

(d)     An award of such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff respectfully demands a trial by jury as to all claims asserted herein.

Respectfully submitted,


*/s/*      *Laura Bailey Brown*
Melody Rayl, MO Bar No. 60362
Laura Bailey Brown, MO Bar No. 62732
**FISHER & PHILLIPS, LLP**
4622 Pennsylvania Avenue, Suite 910
Kansas City, Missouri 64112
Phone: (816) 842-8770
Facsimile: (816) 842-8767
Email: mrayl@fisherphillips.com
Email: lkbrown@fisherphillips.com

ATTORNEYS FOR PLAINTIFFS

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on November 18, 2025, the foregoing document was filed electronically using the Court's CM/ECF system and will be served on Defendants, along with the Summons and First Amended Verified Complaint in this matter, via overnight delivery to:

LET THE VOTERS DECIDE, LLC
Michael Gnesin, Registered Agent
350 E. Las Olas Blvd. 1750
Fort Lauderdale, Florida 33301

Mark A. Jacoby, Founder and Chief Executive Officer of Let the Voters Decide, LLC
52 Riley Road #305
Celebration, Florida 34747

Mark A. Jacoby, Founder and Chief Executive Officer of Let the Voters Decide, LLC
2571 Cyprus Dr., Apt. 104
Palm Harbor, Florida 34684

VORTEX ELITE, LLC
Incorp Services, Inc., Registered Agent
3458 Lakeshore Drive
Tallahassee, Florida 32312

Christopher Pettiford, Founder and President of Vortex Elite, LLC
6500 SW 33rd Street
Miramar, Florida 33023

SYNERGY WISE SOLUTIONS, LLC
United States Corporation Agents, Inc., Registered Agent
Attn: Erik Treutlein
1820 E. Ray Road, #1000
Chandler, Arizona 85225

ONEST MARKETING LLC
Kevin B. Diego, Registered Agent
1900 N. Bayshore Drive 3614
Miami, Florida 33132

<em>/s/     Laura Bailey Brown</em>

## <u>VERIFICATION</u>

I, Billy Rogers, President of Advanced Micro Targeting, Inc., being duly sworn on oath, according to law, state that the facts contained in the foregoing First Amended Verified Complaint for Temporary Restraining Order, Injunctive Relief, and Damages are true and correct to the best of my personal knowledge, information, and belief.

_____
Billy Rogers